WILLIAM L. STERN (CA SBN 96105)
WStern@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105
Telephone: 415.268.7000

JAMES W. HUSTON (CA SBN 115596)
JHuston@mofo.com
ERIN M. BOSMAN (CA SBN 204987)
EBosman@mofo.com
JULIE Y. PARK (CA SBN 259929)
JuliePark@mofo.com
MORRISON & FOERSTER LLP
12531 High Bluff Drive
San Diego, California 92130-2040
Telephone: 858.720.5100
Facsimile: 858.720.5125

Attorneys for Defendant
FITBIT, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES P. BRICKMAN, individually and as a representative of all others similarly situated,<br><br>             Plaintiff,<br><br>    v.<br><br>FITBIT, INC.,<br><br>             Defendant. | Case No. 3:15-cv-2077-JD<br><br>**DEFENDANT FITBIT, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:    November 4, 2015<br>Time:   10:00 a.m.<br>Ctrm:   11, 19th Floor<br><br>The Honorable James Donato<br><br>Date Action Filed:    May 8, 2015 |

FITBIT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT
Case No. 3:15-cv-2077-JD
sd-667858

**TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION AND MOTION ................................................................................................. v

STATEMENT OF THE ISSUES TO BE DECIDED ...................................................................... vi

I.      INTRODUCTION ........................................................................................................... 1

II.     FACTUAL BACKGROUND .......................................................................................... 2

      A.      Fitbit's Wide Range of Activity and Fitness Trackers ........................................... 2

      B.      Plaintiffs' Activity Trackers .................................................................................. 2

      C.      Fitbit's Advertisements and Statements on Sleep Tracking ................................... 3

      D.      Scientific Research on Fitbit's Sleep Tracking Feature ........................................ 4

      E.      Plaintiffs' Allegations ........................................................................................... 4

III.    LEGAL STANDARD ...................................................................................................... 6

IV.     ARGUMENT ................................................................................................................... 6

      A.      Plaintiffs' Claims Are Not Plausible ..................................................................... 6

            1.      Fitbit's Trackers Do What They Claim To Do ........................................... 7

            2.      Fitbit's General Statements Are Puffery .................................................... 9

            3.      No Standard Criteria for Comparing Sleep-Tracking Capability to PSG ........................................................................................................... 11

            4.      No Reasonable Consumer Would Have Been Deceived By the Online Dashboard Depicted on the Product Packaging ........................... 11

            5.      User Input Is Unreliable ............................................................................ 11

      B.      Plaintiffs' Fraud-Based Claims Lack Specificity ................................................ 12

      C.      Plaintiffs' Warranty Claims Fail and Should Be Dismissed ............................... 14

            1.      There Is No Defect .................................................................................... 14

            2.      Plaintiffs Do Not Plead a Particular Purpose .......................................... 14

            3.      Plaintiffs' MMWA Claim Also Fails ....................................................... 15

V.      CONCLUSION .............................................................................................................. 15

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Ang v. Whitewave Foods Co.*,
No. 13-cv-1953, 2013 WL 6492353 (N.D. Cal. Dec. 10, 2013)..............................................7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................... 6, 11, 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................................6

*Block v. eBay, Inc.*,
747 F.3d 1135 (9th Cir. 2014)................................................................................................8

*Clemens v. DaimlerChrysler Corp.*,
534 F.3d 1017 (9th Cir. 2008)..............................................................................................15

*Cook, Perkiss, & Liehe v. N. Cal. Collection Serv.*,
911 F.2d 242 (9th Cir. 1990)................................................................................................10

*Frenzel v. Aliphcom*,
76 F. Supp. 3d 999 (N.D. Cal. 2014) ("*Frenzel I*")....................................................... 1, 10, 12

*Frenzel v. Aliphcom*,
No. 14-cv-03587-WHO, 2015 WL 4110811 (N.D. Cal. Jul. 7, 2015) ("*Frenzel* II")... 1, 12, 13

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
352 F.3d 367 (9th Cir. 2003)..................................................................................................7

*Henderson v. Gruma Corp.*,
No. CV 10-04173 AHM, 2011 WL 1362188 (C.D. Cal. Apr. 11, 2011) ................................6

*Hill v. Hoover Co.*,
899 F. Supp. 2d 1259 (N.D. Fla. 2012) ...............................................................................12

*In re All Terrain Vehicle Litig.*,
771 F. Supp. 1057 (C.D. Cal. 1991) .....................................................................................10

*In re iPhone 4S Consumer Litig.*,
No. C 12-1127 CW, 2014 WL 589388 (N.D. Cal. Feb. 14, 2014) ........................................13

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*,
996 F. Supp. 2d 942 (S.D. Cal. 2014) ....................................................................................8

*Jovine v. Abbott Labs., Inc.*,
795 F. Supp. 2d 1331 (S.D. Fla. 2011) ............................................................................ 7, 12

*Kaplan v. Rose*,
    49 F.3d 1363 (9th Cir. 1994).......................................................................................... 6

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009)...................................................................................... 12

*McKinney v. Google, Inc.*,
    No. 5:10-CV-01177 EJD (PSG), 2011 WL 3862120 (N.D. Cal. Aug. 30, 2011) ................. 13

*Minkler v. Apple, Inc.*,
    65 F. Supp. 3d 810 ................................................................................................... 13, 14

*Newcal Indus., Inc. v. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008)....................................................................................... 9, 10

*Smith v. LG Elecs. U.S.A., Inc.*,
    No. C 13-4361 PJH, 2014 WL 989742 (N.D. Cal. Mar. 11, 2014) ....................................... 15

*Stearns v. Select Comfort Retail Corp.*,
    No. 08-2746 JF, 2009 WL 1635931 (N.D. Cal. June 5, 2009) ................................................ 10

*Tietsworth v. Sears, Roebuck and Co.*,
    720 F. Supp. 2d 1123 (N.D. Cal. 2010) ......................................................................... 10, 14

*Vess v. Ciba-Geigy Corp.*,
    317 F.3d 1097 (9th Cir. 2003).................................................................................. 6, 12, 13

*Werbel v. Pepsico, Inc.*,
    No. C 09-04456 SBA, 2010 WL 2673860 (N.D. Cal. July 2, 2010) ....................................... 6

*Williamson v. Apple, Inc.*,
    No. 5:11-cv-00377 EJD, 2012 WL 3835104 (N.D. Cal. Sept. 4, 2012) ............................ 7, 11

**STATUTES**

15 U.S.C.
    § 2310(d)(1) ............................................................................................................ 15

Federal Rule of Civil Procedure 9...................................................................................... 6, 12, 13

Federal Rule of Civil Procedure 12........................................................................................ 6, 9

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on November 4, 2015 at 10:00 a.m. or as soon thereafter as the matter may be heard, in the United States District Court for the Northern District of California, Defendant Fitbit, Inc. ("Fitbit" or "Defendant") will, and hereby does, move to dismiss the First Amended Complaint ("FAC") of Plaintiffs James P. Brickman and Stephanie Mallick ("Plaintiffs") pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure on the grounds that the FAC fails to state a claim upon which relief can be granted and Plaintiffs' fraud-based claims fail to meet the federal standard for pleading fraud with particularity.

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed Request for Judicial Notice and Declaration of Julie Y. Park, and on such other written and oral argument as may be presented to the Court.

Dated:  September 8, 2015                MORRISON & FOERSTER LLP


                                        By: s/ Erin M. Bosman
                                             Erin M. Bosman

                                             Attorneys for Defendant
                                             FITBIT, INC.

FITBIT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT
Case No. 3:15-cv-2077-JD
sd-667858

iv

**STATEMENT OF THE ISSUES TO BE DECIDED**

This motion raises the following issues:

1. **Implausibility**.  Can Plaintiffs state a claim where no reasonable consumer would have been deceived by Fitbit's conduct?

2. **Rule 9(b) Particularity**.  Can Plaintiffs meet the Rule 9(b) pleading standard for fraud where Defendant has made no representations about the accuracy of its sleep tracking features and Plaintiffs fail to allege which specific statements they relied upon in making their purchase decisions?

3. **Breach of Warranties**.  Can Plaintiffs' breach of warranty claims survive even though they have not alleged a product defect or a particular use other than the product's ordinary purpose?

## I.   INTRODUCTION

According to Plaintiffs, everyone who bought a Fitbit device with a sleep tracking function was deceived because the device does not deliver the accuracy or sophistication of sleep monitoring equipment used by scientists in laboratory settings.  But Fitbit never made any such claim.  Plaintiffs prefer different facts and attempt to rewrite what Fitbit *actually* said, suing for false advertising based on imagined representations.

Fitbit's activity and fitness trackers have enabled millions of users to count steps, compete online with their friends, and lead more active lives.  With a wide range of options for consumers to choose from, Fitbit trackers feature various combinations of sleep tracking, LED displays, silent alarms, the ability to track floors climbed, interchangeable bands, GPS, and heart rate monitoring.  This menu of offerings allows consumers to choose the features that match their lifestyle and the price that matches their budget.

Plaintiffs bring suit individually and on behalf of purported class members that their menu selections were overpriced:  they incorrectly attribute price differences to a single feature, sleep tracking.  Plaintiffs then exaggerate Fitbit's marketing claims about that feature, and ignore the fact that Fitbit's sleep tracking does exactly what it claims to do.

Plaintiffs' undoing is the scientific paper (the "Montgomery-Downs Paper") that they cite in their First Amended Complaint ("FAC").  The Montgomery-Downs Paper disproves their thesis.  It explains that Fitbit's sleep-tracking feature utilizes an accelerometer to measure movement and, based on these movements, is able to detect wakefulness and sleep using sophisticated algorithms.  The trackers do in fact measure sleep.  Fitbit does not represent, warrant or guarantee that its trackers can deliver the accuracy or sophistication of medical devices or clinical sleep monitoring equipment.  No reasonable consumer would read Fitbit's general representations, such as "TRACK YOUR NIGHT," and conclude that Fitbit is representing that its devices measure sleep with the precision of sophisticated laboratory equipment.

In deciding this motion, this Court need look no further than Judge Orrick's orders dismissing nearly identical claims for the same arguments made here.  *Frenzel v. Aliphcom*, 76 F. Supp. 3d 999 (N.D. Cal. 2014) ("*Frenzel I*"); *Frenzel v. Aliphcom*, No. 14-cv-03587-WHO, 2015

WL 4110811 (N.D. Cal. Jul. 7, 2015) ("*Frenzel* II"). These claims should fare no differently.

Mr. Brickman, Ms. Mallick, and every putative class member received exactly what they paid for: a novel, wrist-based activity tracker that does exactly what Fitbit says it does. For all the foregoing reasons, Fitbit respectfully asks this Court to dismiss the FAC with prejudice.

## II.   FACTUAL BACKGROUND

### A.   Fitbit's Wide Range of Activity and Fitness Trackers

Fitbit is the market leader in activity and fitness trackers. Sold direct to consumers and through retailers nationwide, Fitbit's activity and fitness tracker lineup has included Ultra, Zip, One, Flex, Force, Charge, Charge HR, and Surge. (FAC ¶ 11.) Devices currently available for sale are Zip, One, Flex, Charge, Charge HR, and Surge. (RJN Ex. A at 1.)

All of Fitbit's trackers count steps. (*Id.*) They also sync wirelessly to leading smartphones and computers. (*See, e.g., id.* Ex. B at 8.) By syncing their trackers, users have access to Fitbit's online application ("app"), which has a dashboard with tools for users to "[v]iew your progress and analyze your trends with easy-to-read charts and graphs." (*Id.* Ex. D at 9.)

Other features vary among trackers. For example, Zip, the lowest priced tracker, has a clip-on design. (RJN Ex. B at 8.) It features a replaceable battery that lasts up to six months and an LCD display without backlighting. (*Id.* at 2.) Designed with simplicity in mind, Zip tracks activity, but does not track floors climbed or sleep. (*Id.* Ex. A at 1.) Fitbit's most basic activity tracker, Zip retails at a price at least $30 less than any other Fitbit tracker. (FAC ¶ 13.)

Fitbit One, like Zip, is a clip-on tracker that counts steps. But it contains a number of features that Zip does not, including sleep tracking. (*Id.*) Branded as "One powerful, motivating tracker," One also tracks the number of floors climbed. (RJN Ex. C at 2.) It features an OLED display that can be read in the dark and has a rechargeable battery. (*Id.* Ex. C at 9.) In addition to tracking sleep, One contains a vibrating motor (such as those found in cell phones) that powers its silent alarm. (*Id.*)

### B.   Plaintiffs' Activity Trackers

Plaintiff Brickman purchased a Fitbit Flex on or about November 29, 2013 for $99. (FAC ¶¶ 32-33.) Flex debuted in May 2013 as Fitbit's first wrist-worn activity and fitness tracker. The

wrist-based tracker was made possible by technical advances in the accelerometer and algorithms used to track steps.  (RJN Ex. D at 10.)  Flex tracks steps and sleep.  (*Id.* Ex. A at 1.)  It has an LED light display that shows progress toward a user's daily step goal.  (*Id.* Ex. D at 10.)  Like One, Flex has a silent alarm.  (*Id.* Ex. A at 1.)  Flex is unique among Fitbit trackers in having interchangeable bands.  (*Id.* Ex. D at 6.)  Fitbit offers color and designer bands, which introduce yet another dimension of enjoyment and novelty for Fitbit users.  (*Id.* Ex. H at 1.)

Plaintiff Mallick purchased a Fitbit Charge HR on or about February 4, 2015, for $149.99.[1]  (FAC ¶¶ 40-41.)  Charge HR features PurePulse™ heart rate monitoring, a watch and call notifications with caller ID, among other features.  (*Id.* Ex. F at 2.)[2]

### C.    Fitbit's Advertisements and Statements on Sleep Tracking

In advertising its products, Fitbit highlights an individual product's unique combination of features as part of a complete package.  Sleep tracking is just one part of that package.  For example, Fitbit urges its users to "Get fit.  Sleep better.  All in one."  (RJN Ex. C at 1.)  "Flex never sleeps—even when you do.  Wear it all night to measure your sleep quality and how long you slept.  Then, wake with a silent, vibrating alarm to start your day stepping on the right foot."  (*Id.* Ex. D at 5.)  On the packaging, users can read that Flex helps "TRACK YOUR DAY" with steps, distance, calories burned, and active minutes.  (FAC Ex. B.)  Similarly, the packaging boasts that Flex helps users "TRACK YOUR NIGHT" with ***hours*** slept, times woken up, sleep quality, and a silent vibrating alarm.  (*Id.* ¶ 13 & Ex. B (emphasis added).)  The packaging does not claim to track minutes slept, nor does it claim to "accurately" track sleep.  (*Id.*)

After a user has registered and synced a device to his Fitbit account, the online dashboard displays information to the user about the amount and quality of sleep.  (*Id.* ¶¶ 15-16.)  An image of the dashboard is shown on Flex's product packaging to convey that users can "SYNC YOUR

---

[1] Although Plaintiff Mallick alleges she purchased a Charge, her receipt is for a Charge HR.  (FAC Ex. C.)  The model she purchased in no way affects the ultimate conclusion that her claims should be dismissed.  Fitbit further notes that based on the date of her purchase, Plaintiff Mallick agreed to arbitrate any claims against Fitbit and not to pursue any class actions.  Should the parties fail to resolve this issue, Fitbit will move to compel arbitration of her claims.

[2] Similarly, Fitbit's Force, Charge, and Surge trackers sport a variety of features designed to help users track their fitness goals.  (*See* RJN Exs. E, G.)

STATS REAL-TIME"—i.e., that users can sync the device wirelessly to their smartphones or computers. (*Id.*)  The dashboard graphic on the product packaging is not intended to convey any specific information about other product features, which is evident from the small size of the graphic.[3]  Indeed, any numerical information is nearly illegible.  Nowhere does the product packaging claim "accurate" sleep tracking, nor does it ever claim that the product can provide scientifically precise statistics about the user's sleep.  (*See id.*)

### D.   Scientific Research on Fitbit's Sleep Tracking Feature

The Montgomery-Downs Paper compared Fitbit's sleep tracking to polysomnography and actigraphy, two advanced sleep monitoring technologies used by professional sleep doctors and scientists.  (FAC ¶ 21; RJN Ex. I.)  According to the Montgomery-Downs Paper, "[p]olysomnography (PSG) is considered the 'gold-standard' for sleep measurement.  Its disadvantages include high-cost, time-intensiveness, [and] intrusiveness."  (RJN Ex. I at 914.)  Actigraphy "is relatively low-cost, non-intrusive, and ambulatory."  (*Id.*)  The Montgomery-Downs Paper noted that "[s]imilar to actigraphy, the Fitbit system relies on movement and absence of movement to infer sleep and wake."  (*Id.* at 916.)  In addition, "Fitbit devices show acceptable reliability between devices, demonstrating that different devices perform consistently compared to each other."  (*Id.*)  Importantly, the Montgomery-Downs Paper conceded its own limitations:  "the sleep field has not established standard criteria for agreement between PSG and new technologies."  (*Id.* at 917.)  Nonetheless, the Montgomery-Downs Paper concluded that Fitbit's sleep tracking function has "decided improvements . . . over standard actigraphy:  it has much lower cost; it allows web-based interface so that the researcher can access data downloaded from the home of any participant with a web-accessible computer; and as long as the device is returned to its docking station every 4 days, the battery life is unlimited."  (*Id.*)

### E.   Plaintiffs' Allegations

Despite the documented ability of Fitbit trackers to measure sleep, Plaintiffs claim that

---

[3] Plaintiffs have magnified the graphic on Page 5 of the FAC, lines 1-14, nearly threefold.  On the Flex product packaging, that image fits into a space that is 2 inches tall and 2 ¼ inches wide.  (*See* FAC Ex. B.)

Fitbit's "representations that Plaintiff [] would receive a working and functional sleep-tracking feature were false." (FAC ¶¶ 37, 45.) And despite the wide range of features Fitbit offers in its trackers, Plaintiffs insist that Zip "contains the same fundamental features of the other Fitbit devices EXCEPT the sleep-tracking function." (*See, e.g.*, *id.* ¶ 85.) On that basis, Plaintiffs claim, they have suffered injury because they paid at least $30 more than they would have paid for Zip in reliance on representations made in Fitbit's product packaging. (*Id.* ¶¶ 36, 44.) Plaintiffs further claim that Fitbit represented and warranted to consumers that its products measure sleep with absolute precision and accuracy, but that the Fitbit products are not as accurate as medical diagnostic tools such as polysomnography and actigraphy because they overestimate the amount of time slept. (*Id.* ¶¶ 18-26.) As support for their claims, Plaintiffs allege that Fitbit's sleep-tracking function cannot work "with any accuracy whatsoever because the Fitbit devices *can only measure movement* and not sleep." (*Id.* 26 (emphasis added).) Notably, the "scientifically accepted technology" of actigraphy "measure[s] gross motor activity"—i.e., movement and not sleep. (*See id.* ¶ 20.)

Although Plaintiffs "expressly disclaim any recovery for physical injury," they claim that Fitbit's overestimation of sleep "implicate[s] serious public health concerns, as thinking you are sleeping *up to 67 minutes more than you actually are* can obviously cause health consequences." (*Id.* ¶ 28 (emphasis in original).) Plaintiffs assert that "reasonable consumers are likely to be deceived by Defendant's representations." (*Id.* ¶ 29.)

Based on these alleged misrepresentations, Plaintiffs have pled nine causes of action against Fitbit individually and on behalf of two putative classes, one comprising California residents ("California class") and one comprising Florida residents ("Florida class"): (1) unfair business practices under the California Unfair Competition Law ("UCL"); (2) false advertising under the California False Advertising Law ("FAL"); (3) unfair and deceptive practices under the Consumer Legal Remedies Act ("CLRA"); (4) violation of the Magnuson-Moss Warranty Act ("MMWA"); (5) breach of implied warranty under California common law; (6) violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"); (7) common law fraud; (8) negligent misrepresentation; and (9) unjust enrichment.

### III.   LEGAL STANDARD

Under Rule 12(b)(6), dismissal of a case is warranted if the complaint lacks "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* However, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

Federal Rule of Civil Procedure 9(b) requires that fraud claims "state with particularity the circumstances constituting fraud or mistake." Under this standard, "[t]he pleadings must state precisely the time, place, and nature of the misleading statements, misrepresentations, and specific acts of fraud." *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994). The pleading must be "specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation omitted).

### IV.   ARGUMENT

#### A.   Plaintiffs' Claims Are Not Plausible

A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (citation omitted). A "plaintiff [must] plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Twombly*, 550 U.S. at 570.

Moreover, "statements are only actionable under [the UCL, CLRA, and FAL] if they are likely to deceive a reasonable consumer," which requires "the plaintiff [to] 'show that members of the public are likely to be deceived.'" *Henderson v. Gruma Corp.*, No. CV 10-04173 AHM (AJWx), 2011 WL 1362188, at *10 (C.D. Cal. Apr. 11, 2011) (citing *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995)). "[W]here a court can conclude as a matter of law that members of the public are not likely to be deceived by the product packaging, dismissal is appropriate." *Werbel v. Pepsico, Inc.*, No. C 09-04456 SBA, 2010 WL 2673860, at *3 (N.D. Cal. July 2, 2010);

*see also Williamson v. Apple, Inc.*, No. 5:11-cv-00377 EJD, 2012 WL 3835104, at *6 (N.D. Cal. Sept. 4, 2012) (dismissing CLRA, UCL, FAL, and breach of express warranty claim based on allegations that defendant represented that the glass housing on its phone was drop-proof because "it is a well-known fact of life that glass can break under impact, even glass that has been reinforced"); *Ang v. Whitewave Foods Co.*, No. 13-cv-1953, 2013 WL 6492353, at *4 (N.D. Cal. Dec. 10, 2013) (dismissing UCL, FAL, and CLRA claims for lack of plausibility where plaintiffs asserted consumers would confuse soy milk or almond milk for dairy milk).

The same standard applies to claims brought under the FDUTPA. *Jovine v. Abbott Labs., Inc.*, 795 F. Supp. 2d 1331, 1342 (S.D. Fla. 2011) (noting that "in a FDUTPA action 'the question is not whether the plaintiff actually relied on the alleged deceptive trade practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances'") (quoting *Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699 (Fla. Dist. Ct. App. 2000)).

A plausible claim of deception is also a necessary element of Plaintiffs' fraud and negligent misrepresentation claims. *See Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003) ("both fraud and negligent misrepresentation as causes of action require [plaintiff] to demonstrate it justifiably relied on [defendant's] misrepresentations"); *Jovine*, 795 F. Supp. 2d at 1338 (essential element of negligent misrepresentation is that "injury must result to the party acting ***in justifiable reliance*** on the misrepresentation" (emphasis added)).

Finally, Plaintiffs' unjust enrichment claim relies on a plausible allegation of deception as Plaintiffs seek recovery for the profits retained from the "conduct alleged herein," all of which is based on Fitbit's alleged misrepresentations.  (FAC ¶ 144.)

Plaintiffs cannot show that a reasonable consumer would be deceived by Fitbit's statements about sleep tracking.  Their claims of deception are implausible as a matter of law for five reasons.

### 1.    Fitbit's Trackers Do What They Claim To Do

Plaintiffs claim to expect down-to-the minute, scientifically accurate sleep measurements based on Fitbit's representations.  Their expectations are misplaced.  A plaintiff may not bring a UCL or CLRA claim based on false advertising where the plaintiff unjustifiably exaggerates the

defendant's actual statements.  In *Block v. eBay, Inc.*, 747 F.3d 1135, 1140 (9th Cir. 2014), the Ninth Circuit held that a reasonable person could not have relied on conversational representations that eBay is "not involved" and has "no agency" to believe that eBay would not offer automatic bids on customers' behalf.  In *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 990 (S.D. Cal. 2014), Sony represented that access to the "Play Station Network" and online connectivity were features of the console.  The court held this could not be interpreted to mean that network access would be uninterrupted.  *Id.*

Here, Plaintiffs have similarly exaggerated Fitbit's statement in an attempt to bolster their claims.  According to the FAC, Fitbit represented that its "devices can make specific, mathematical measurements and calculations as to the amount and quality of the wearer's sleep." (FAC ¶ 74.)  Plaintiffs further assert that consumers are "likely" to believe that Fitbit's trackers "will track, to the minute, the amount they sleep and the quality and efficiency to an exact percentage point, of that sleep."  (*Id.* ¶ 75.)  Plaintiffs even go so far as to claim deception on the basis that Fitbit's sleep-tracking function lacks "any accuracy whatsoever."  (*Id.* ¶ 26.)  Not one of these allegations is plausible.  Fitbit's statements that the products can track "hours slept," "times woken up," or "sleep quality" do not promise scientifically calibrated or medical device level accuracy.  They do not even promise to track sleep down "to the minute," contrary to Plaintiffs' allegations.  (*Compare id.* ¶ 75 *with id.* Ex. B.)  Fitbit only promises that its trackers can track sleep, a fact confirmed by the very paper cited by Plaintiffs:  the Fitbit tracker works by "rel[ying] on movement and absence of movement to infer sleep and wake."  (RJN Ex. I at 916.) Just as in *Block* and *Sony*, Plaintiffs should not be permitted to turn Fitbit's representations into something they are not.

Plaintiffs rely on the Montgomery-Downs Paper in asserting that Fitbit's sleep-tracking function is "substantially less accurate than any scientifically-accepted method of sleep-tracking." (FAC ¶ 23.)  Yet the "gold-standard" method of PSG to which Plaintiffs compare Fitbit's sleep-tracking function (*id.* ¶ 20) is an overnight study, which used "[m]ultichannel data acquisition equipment . . . , chin electromyography, bilateral electrooculography, electrocardiogram, and anterior tibialis electromyography" with "[s]imultaneous audio/video monitoring" (RJN Ex. I at

914).  Even actigraphy, another scientific sleep tracking method which is less accurate than PSG, but allegedly more accurate than Fitbit's trackers, has disadvantages to Fitbit:  compared to actigraphy, Fitbit's sleep tracking "has much lower cost."  (*Id.* at 917.)

No reasonable consumer could share Plaintiffs' alleged expectation that Fitbit's $99-$150 fitness trackers were intended to deliver the precision of a scientific sleep study, which often requires an overnight stay at a research facility and costs significantly more.  Not when Plaintiffs' Fitbit trackers include a plethora of other activity and fitness tracking features.  In Plaintiff Brickman's case, his Flex tracker included step-tracking, an LED progress light, a silent alarm, and interchangeable bands.  In Plaintiff Mallick's case, her Charge HR tracker featured step-tracking, a watch, call notifications, and a heart-rate monitor.[4]

## 2.    Fitbit's General Statements Are Puffery

General statements that would not induce consumer reliance are non-actionable puffery.  Fitbit's statements about sleep tracking are exactly the type of "general, subjective claim[s] about a product" on which a deception claim cannot be based.  "[T]he determination of whether an alleged misrepresentation 'is a statement of fact' or is instead 'mere puffery' is a legal question that may be resolved on a Rule 12(b)(6) motion.").  *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1053 (9th Cir. 2008) (citations omitted).  In the Ninth Circuit:

> A statement is considered puffery if the claim is extremely unlikely to induce consumer reliance.  Ultimately, the difference between a statement of fact and mere puffery rests in the specificity or generality of the claim.  The common theme that seems to run through cases concerning puffery in a variety of contexts is that consumer reliance will be induced by specific rather than general assertions.  Thus, a statement that is quantifiable, that makes a claim as to the specific or absolute characteristics of a product, may be an actionable statement of fact while a general, subjective claim about a product is non-actionable puffery.

---

[4] That Plaintiffs were harmed $30 is similarly implausible.  Plaintiffs calculate this amount by wrongly concluding that Zip differs from other trackers only due to the sleep tracking function.  A quick study of Fitbit's website proves them wrong.  (RJN Ex. A at 1.)  Compared to Flex, Zip cannot be worn on the wrist and lacks an LED display, silent alarm, and interchangeable bands.  (*Compare id.* Ex. B *with id.* Ex. D.)  Charge HR includes a watch, call notifications, caller ID, and heart rate monitoring.  A reasonable consumer would expect and understand that the $99-$150 purchase price includes all of these features.  Plaintiffs should have understood this, too.

*Id.* (internal citations and quotation marks omitted) (citing *Cook, Perkiss, & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 245-46 (9th Cir. 1990)).

Fitbit advertised that the devices "'track hours slept,' track 'times woken up', and track the 'quality of sleep.'" (FAC ¶ 13 (citing product packaging).)  According to the FAC, Fitbit states in an unspecified place that its products "'measure your sleep quality,' and '[o]nce the data syncs, graphs on your (device) dashboard will reveal how long you slept and the number of times you woke up, giving you a 'sleep quality score'". (*Id.* ¶ 14.)  Fitbit does not claim to track sleep down to the minute, nor have Plaintiffs so alleged.  Fitbit simply promises that users will generally be able to track sleep and the "quality of sleep," without quantifying what type of "score" the activity trackers can provide or on what basis the "quality of sleep" will be measured.

Courts have routinely held that general representations such as Fitbit's constitute non-actionable puffery.  *See, e.g.*, *Cook, Perkiss & Liehe*, 911 F.2d at 246 (finding it was "beyond the realm of reason to assert" that a reasonable consumer would interpret as a factual claim the statement that "we're the low cost commercial collection experts"); *Tietsworth v. Sears, Roebuck and Co.*, 720 F. Supp. 2d 1123, 1136 (N.D. Cal. 2010) (statements that washing machines were "designed and manufactured for years of dependable operation" and "save you time by allowing you to do fewer, larger loads" were puffery); *Frenzel I*, 76 F. Supp. 3d at 1011 (general statement that activity tracker helps users "understand your sleep and wake up refreshed" constitutes "the sort of vague statements about general functionality that are not actionable under California's consumer protection statutes."); *In re All Terrain Vehicle Litig.*, 771 F. Supp. 1057, 1061 (C.D. Cal. 1991) (use of name "all terrain vehicle" or "all-weather tires" is puffery, as is statement that vehicle is "precisely balanced in the frame for superb handling"); *Stearns v. Select Comfort Retail Corp.*, No. 08-2746 JF, 2009 WL 1635931, at *11 (N.D. Cal. June 5, 2009) (statement that bed would be "maintenance free" and provide "constant and wear free support night after night" were puffery despite fact that beds need to be cleaned periodically because "no consumer reasonably could have [] expectation" that any product would be maintenance free).  Similarly, Fitbit's general statements about sleep tracking would not mislead a reasonable consumer to believe that a Fitbit activity tracker could measure sleep with scientific accuracy.

### 3. No Standard Criteria for Comparing Sleep-Tracking Capability to PSG

In light of the fact that "the sleep field has not established standard criteria for agreement between PSG and new technologies" (RJN Ex. I at 917), it is unclear even on what basis Plaintiffs challenge the accuracy of Fitbit's sleep-tracking feature. The notion that Fitbit's activity trackers are "substantially less accurate than any scientifically-accepted method of sleep tracking" (FAC ¶ 23) is implausible in light of the Montgomery-Downs Paper cited in Plaintiffs' own FAC.

### 4. No Reasonable Consumer Would Have Been Deceived By the Online Dashboard Depicted on the Product Packaging

Plaintiffs cite to the online dashboard shown on the product packaging in support of their claims: "The images of the 'dashboard' on the packaging depict specific numbers presented to the consumer as exact times." (FAC ¶ 16.) There are two problems with this allegation. First, a reasonable consumer would not read all of the words contained in this graphic, which is clearly intended to illustrate wireless synchronization capabilities. The words are simply too small. (*See id.* Ex. B.) Second, "specific" and "exact" are Plaintiffs' words, not Fitbit's. Nowhere does Fitbit advertise that its devices' sleep-tracking feature can track every second of sleep. (*See generally id.*) Nor, as discussed above, would a reasonable consumer have so believed.

### 5. User Input Is Unreliable

Plaintiff Brickman's Flex tracker does not feature automatic sleep tracking and *relies on user input to track sleep*. In order to track sleep, the user must "tell" his Fitbit to enter sleep or wake mode by tapping it "rapidly for one or two seconds" or by manually entering the time he slept. (*See* RJN Ex. J at 11.) Just as in *Williamson*, Plaintiff Brickman's claims should be dismissed because his claims contradict a "well-known fact of life": it is impossible for a consumer to self-record with 100% precision when he fell asleep and when he awoke. *See Williamson*, 2012 WL 3835104, at *6. A reasonable consumer would not believe, as Plaintiffs baldly assert, that Fitbit trackers "will track, to the minute, the amount they sleep and the quality and efficiency, to an exact percentage point, of that sleep." (FAC ¶ 75.) Nor is the Court "bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678. A reasonable consumer would expect to receive a feature-packed fitness tracker that has a functional

sleep tracking mechanism.  That is exactly what Plaintiffs received.

Plaintiffs' claims of deception are implausible.  On this basis, their UCL, FAL, CLRA, FDUTPA, fraud, negligent misrepresentation, and unjust enrichment claims should be dismissed.

### B.      Plaintiffs' Fraud-Based Claims Lack Specificity

Plaintiffs' first, second, and third causes of action (violation of the UCL, FAL, and CLRA), sixth cause of action (violation of the FDUTPA), and seventh cause of action (fraud) are all fraud-based claims subject to the heightened pleading standard of Rule 9(b).  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126-27 (9th Cir. 2009) (consumer deception claims that rely on allegations of fraudulent conduct are subject to Rule 9(b) heightened pleading standards); *see also Frenzel I*, 76 F. Supp. 3d at 1011 (dismissing plaintiff's fraud-based UCL, FAL, and CLRA claims for failure to meet Rule 9(b) pleading standard); *Jovine*, 795 F. Supp. 2d at 1343 n.9, applying the Rule 9(b) heightened pleading standard for a FDUTPA claim based on fraudulent conduct); *but see Hill v. Hoover Co.*, 899 F. Supp. 2d 1259, 1263 (N.D. Fla. 2012) (Rule 9(b) standard does not apply to FDUTPA claims based on *unfair* or *unlawful* conduct).  As such, plaintiffs must "state with particularity the circumstances constituting fraud."  *Kearns.*, 567 F.3d at 1126 (quoting Fed. R. Civ. P. 9(b)).  This heightened pleading standard requires plaintiffs to allege "the who, what, when, where, and how" of the fraud.  *Vess*, 317 F.3d at 1106.

Under this standard, Plaintiffs' claims fail because they have not alleged that they relied on any claims of "accuracy."  Plaintiffs quote no specific statements that Fitbit made about the accuracy of its sleep tracking features, or that its products' sleep tracking function would be as accurate as polysomnography or actigraphy.  In *Frenzel II*, Judge Orrick dismissed nearly identical claims against an activity tracker manufacturer.  *Frenzel II*, 2015 WL 4110811, at *12.  Just like Plaintiffs here, the only representations the *Frenzel* plaintiff alleged he relied on "were those on the [product] box, none of which used the word 'accurately.'"  *Id.*  Instead, the product packaging used terms such as "measure" and "track" to describe what the activity tracker could do.  *Id.*  Because the *Frenzel* plaintiff never relied on a representation that the activity tracker would "accurately" measure any metric, the court dismissed his CLRA, UCL, and FAL claims with prejudice, to the extent they were based on misrepresentations regarding accuracy.  *Id.*

Plaintiffs' fraud-based claims against Fitbit should be dismissed for the same reasons. Plaintiffs complain that Fitbit promised to provide "accurate" sleep-tracking statistics. (*See, e.g.*, FAC ¶ 24.) But again, these are Plaintiffs' words, not Fitbit's. Just as in *Frenzel II*, Plaintiffs only allege that they relied on the product packaging.[5] Just as in *Frenzel II*, nowhere on the packaging does Fitbit claim to deliver "accurate" sleep-tracking information. Just as in *Frenzel II*, Fitbit promises only to "track" the user's activity and sleep. Only one conclusion follows: just as in *Frenzel II*, Plaintiffs' claims should be dismissed with prejudice.

Other courts have dismissed similar fraud claims where the plaintiff failed to allege that the defendant made specific statements that a particular product feature would work flawlessly and without interruption. *See, e.g.*, *Minkler v. Apple, Inc.*, 65 F. Supp. 3d 810, 821 (N.D. Cal. 2014) (dismissing fraud claim based on inconsistencies in the Apple Maps application because plaintiff "failed to identify any specific statement by Apple that expressly indicates that Apple Maps would always work flawlessly and without error."); *In re iPhone 4S Consumer Litig.*, No. C 12-1127 CW, 2014 WL 589388, at *6 (N.D. Cal. Feb. 14, 2014) ("Plaintiffs do not allege any specific statement by Apple that expressly indicates that Siri would be able to answer every question, or do so consistently."); *McKinney v. Google, Inc.*, No. 5:10-CV-01177 EJD (PSG), 2011 WL 3862120, at *5 (N.D. Cal. Aug. 30, 2011) (dismissing fraud claim where plaintiff failed to plead facts sufficient to show a representation that "the Nexus One would maintain consistent 3G connectivity"). Fitbit has made no similar representations about the performance of its sleep tracking feature.

Plaintiffs allege that Fitbit represents to consumers that it can "determine, to an exact percentage, the quality of the consumer's sleep." (*See* FAC ¶ 83.) But nowhere in the FAC do Plaintiffs state with any particularity where or how Fitbit makes these alleged statements or where

---

[5] Plaintiffs quote one statement of Fitbit's not on the packaging: "Once the data syncs, graphs on your (device) dashboard will reveal how long you slept and the number of times you woke up, giving you a 'sleep quality score.'" (FAC ¶ 14.) Plaintiffs have not alleged where this representation was made, nor does it appear on the product packaging attached to the FAC as Exhibit B. To the extent Plaintiffs claim to have relied on this representation, such claim omits the requisite "when, where, and how" and therefore fails to meet Rule 9(b)'s heightened pleading standard. *See Vess*, 317 F.3d at 1106

and when Plaintiffs were exposed to them.  Plaintiffs have failed to plead facts with sufficient particularity to support their fraud-based claims, and the Court should not accept Plaintiffs' conclusory allegations and conclusions of law.  *See Iqbal*, 556 U.S. at 678.  Plaintiffs' UCL, FAL, CLRA, FUDTPA, and fraud claims should be dismissed.

### C.    Plaintiffs' Warranty Claims Fail and Should Be Dismissed

#### 1.    There Is No Defect

To establish a breach of implied warranty of merchantability, Plaintiffs must allege a "fundamental defect that renders the product unfit for its ordinary purpose." *Tietsworth,* 720 F. Supp. 2d at 1142; *see also Minkler*, 2014 WL 4100613.  In *Minkler*, the plaintiff sued for breach of implied warranty of merchantability over the functionality of the Apple Maps application.  *Id.* at *2.  The court dismissed the plaintiff's claim for two reasons.  First, the plaintiff did not "allege that the ordinary purpose of the iPhone 5 was navigational capability.  The iPhone 5 has a multitude of uses . . . [and] Plaintiff never alleges that she used the iPhone solely for navigation." *Id.* at *5.  Second, the plaintiff did not "allege a fundamental defect in the software.  Although she alleges several problems exist in the software, she has not alleged that Apple Maps failed to work at all or even that it failed to work a majority of the time." *Id.*

The same logic applies here.  Replace "iPhone 5" with "Flex" and "navigation" and "Apple Maps" with "sleep tracking," and *Minkler* turns into this case, minus the alleged problems.  Like the iPhone, Fitbit's trackers have a multitude of uses—step count, silent alarm, floors climbed, time of day.  Sleep tracking is not the only function of Fitbit's products.  Nor have Plaintiffs alleged that the sleep tracking function failed to work at all.  Just as the *Minkler* plaintiff failed to state a claim, Plaintiffs here "has not alleged a plausible claim for relief under breach of implied warranty," and this cause of action should be dismissed.  *Id.*

#### 2.    Plaintiffs Do Not Plead a Particular Purpose

Plaintiffs' claim for breach of implied warranty of fitness for a particular purpose is equally deficient.  A "'particular purpose' differs from 'the ordinary purpose for which the goods are used' in that it 'envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the

concept of merchantability and go to uses which are customarily made of the goods in question.'" *Smith v. LG Elecs. U.S.A., Inc.*, No. C 13-4361 PJH, 2014 WL 989742, at *7 (N.D. Cal. Mar. 11, 2014) (dismissing claim for breach of implied warranty of fitness against washing machine manufacturer relating to a defective electrical panel where plaintiff "pled no facts showing that her purpose was anything other than the ordinary one of washing clothes.").

Plaintiffs make the legal conclusion that the products in question "were designed for . . . the particular purpose of tracking the consumer's sleep." (FAC ¶ 120.) Indeed, Fitbit designed many of its products to offer sleep tracking as part of a user's overall fitness tracking capabilities. But nothing in Plaintiffs' FAC suggests that sleep tracking is "a specific use by the buyer which is peculiar to the nature of his business." *Smith*, 2014 WL 989742, at *7. Instead, it is evident that sleep tracking is available to, and an intended use for, many consumers who purchase a Fitbit product with sleep-tracking capabilities. Plaintiffs have failed to plead any particular purpose Fitbit knew about, let alone how Fitbit's devices have breached that obligation. Plaintiffs' breach of implied warranty claim should be dismissed.

### 3. Plaintiffs' MMWA Claim Also Fails

The MMWA provides that "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this title, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief." 15 U.S.C. § 2310(d)(1). Here, Plaintiffs' warranty allegations arise exclusively under state law. Accordingly, Plaintiffs' MMWA claims will "stand or fall with his express and implied warranty claims under state law." *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008). Because Plaintiffs have failed to state a claim for breach of warranty under state law, their MMWA claim should be dismissed as well.

### V. CONCLUSION

For all of the foregoing reasons, Fitbit respectfully asks the Court to dismiss Plaintiffs' FAC in its entirety, without leave to amend.

Dated:  September 8, 2015                    MORRISON & FOERSTER LLP


                                             By:  s/Erin M. Bosman
                                                  Erin M. Bosman

                                                  Attorneys for Defendant
                                                  FITBIT, INC.