# EXHIBIT C

                                              **Pages 1 - 25**

                  UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

JAMES P. BRICKMAN, ET AL.,        )
                                  )
            Plaintiffs,           )
                                  )
   VS.                            )     **NO. CV 15-02077-JD**
                                  )
FITBIT, INC.,                     )
                                  )
            Defendant.            )
_____  )

                              San Francisco, California
                              Thursday, March 30, 2017

                  **TRANSCRIPT OF PROCEEDINGS**

<u>**APPEARANCES**</u>:

For Plaintiffs:
                        DWORKEN & BERNSTEIN
                        1468 W. 9th Street
                        Cleveland, OH  44113
                  BY:   **PATRICK J. PEROTTI, ESQUIRE**
                        **FRANK BARTELA, ESQUIRE**

                        BONEZZI, SWITZER, POLITO & HUPP
                        1300 East Ninth Street - Suite 1950
                        Cleveland, OH  44114
                  BY:   **RONALD MARGOLIS, ESQUIRE**

                        LAW OFFICES OF JOHN A. KITHAS
                        One Embarcadero Center - Suite 1020
                        San Francisco, CA  94111
                  BY:   **CHRISTOPHER LAND, ESQUIRE**


Reported By:            Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                        Official Reporter

APPEARANCES CONTINUED:


For Defendant:
                    MORRISON & FOERSTER LLP
                    425 Market Street
                    San Francisco, CA  94105
              BY:   **WILLIAM L. STERN, ESQUIRE**
                    **ALEXANDRA E. LAKS, ESQUIRE**

                    MORRISON & FOERSTER LLP
                    707 Wilshire Boulevard
                    Los Angeles, CA  90017
              BY:   **KAI S. BARTOOMEO, ESQUIRE**

                    MORRISON & FOERSTER LLP
                    12531 High Bluff Drive - Suite 100
                    San Diego, CA  92130
              BY:   **ERIN M. BOSMAN, ESQUIRE**

**Thursday - March 30, 2017**                          **10:37a.m.**

                          **P R O C E E D I N G S**

                                **---oOo---**

        **THE CLERK:**  Calling CV 15-2077, Brickman vs. Fitbit, Inc.

     Counsel, please state your appearances for the record.

        **MR. PEROTTI:**  Patrick J. Perotti --

        **THE COURT:**  Come up so I can hear you.

        **MR. PEROTTI:**  Patrick J. Perotti, P-E-R-O-T-T-I, with Dworken & Bernstein, and Frank Bartela, also of the same firm, as one of the counsel for the plaintiffs.

        **MR. MARGOLIS:**  Good morning, Your Honor.  My name is Ronald Margolis.  I'm with the firm of Bonezzi, Switzer, Polito & Hupp, co-counsel.

        **MR. LAND:**  And Christopher Land with the Law Offices of John Kithas for the plaintiffs.

        **THE COURT:**  Anybody else?  Okay.

        **MR. STERN:**  Good morning, Your Honor.  William Stern for the defendant.

        **MR. BARTOLOMEO:**  Good morning, Your Honor.  Kai Bartolomeo, also on behalf of the defendant.

        **MS. BOSMAN:**  Good morning, Your Honor.  Erin Bosman for Fitbit.

        **MS. LAKS:**  Good morning, Your Honor.  Alexandra Laks for Fitbit as well.

**THE COURT:** Let's start with class certification. Who is going to take the lead on the defense side and on the plaintiffs' side? Come on up. All right.

So, plaintiffs, you are going to withdraw breach of implied warranty, Magnuson-Moss, and California false advertising; is that right?

**MR. PEROTTI:** Yes, Your Honor, we are.

**THE COURT:** Okay. We will deem those claims dismissed. That leaves UCL, CLRA, Florida accepted practices, common law fraud, misrep, and unjust enrichment, which is not a claim, so -- in California it's not a claim. It's a remedy. Okay? We don't need to get hung up on that.

So I'm having trouble, Mr. Stern, seeing why class cert is not a sensible thing to do. It is a single device, an easily-identifiable device. Purchase records or the ownership records are going to be readily ascertainable, certainly under the Ninth Circuit's most recent articulation of ascertainability. It is all based on a common objective plan of advertising and representation by Fitbit.

The damages -- you know, restitution is a perfectly traditional and reasonable remedy in a situation like this. It's two state classes, California and Florida; is that right?

**MR. PEROTTI:** Yes, Your Honor.

**THE COURT:** Okay. Whether they win or lose, different issue of course, but it looks to me like Rule 23 is imminently

suited, and I just did not see anything that persuaded me to the contrary.  So give me your top two reasons.  I think I know what they are, but I want to hear them again.

MR. STERN:  I have four reasons, but I can still do them in about five minutes, if it's anything close to what my practice --

THE COURT:  I will double the reasons to four.

MR. STERN:  Let's see how far we get.

There are four reasons why the Court should deny class certification.  The first reason -- and, by the way, none of these are merits issues.  I'm going to focus on class certification, Rule 23 issues.

The first reason is what does "tracks sleep" mean.  So the background I think the Court knows.  This case is a false advertising case.  It stems from the package phrase -- and I brought a demonstrative with me.  If you'd like, I can hand it up.

THE COURT:  They're the same ones in the Complaint, aren't they?

MR. STERN:  It's the same one in the Complaint.  This happens to be a three-dimensional one.

The package statement has four phrases on it that are allegedly actionable:  "Tracks sleep," "hours slept," "times woken up," and "sleep quality."

So my first ground, what does "tracks sleep" mean -- and

I'm going to use that as shorthand for all four of these phrases -- has three problems.

The first problem is that plaintiffs have offered two different meanings and that matters because, Your Honor, if plaintiffs themselves can't agree on what the term "tracks sleep" means, how do they expect to show, through common evidence, that a majority of class members, first of all, adopted that meaning, and, second, bought in reliance or thought that meaning was the first meaning and not the second meaning or whether that was material to their purchase.

This matters because it has direct consequences to the overbreadth of the class and it also affects the damages theory, but I'm getting ahead of myself --

THE COURT:  Let me just jump in.  I know -- this is all in your briefs, presented there.  So what I'm asking you really to do now is just talk to me in a plain and simple practical manner.  I've told you where my inclination is, so you need to say, "Judge, here are the two reasons why you ought to flip that inclination."  None of those reasons have persuaded me.

The case law is very clear that the things that you're looking at are not going to be an impediment to certification. So the bottom line here is they held them in order to -- the motion to dismiss order is -- it's very straightforward. People bought the device because it was represented that,

rightly or wrongly -- that's for another day.  Okay?  This is just the Complaint.  I'm not endorsing anything.  But rightly or wrongly, "this is going to help you track your sleep."

That is not -- that's a term folks understand without a lot of song and dance.  Okay?  My parents would get it.  The people I know in the world understand what the representation is.  So I don't think there is a fatal ambiguity or uncertainty in the meaning.  It's like "a hundred percent" or "no artificial ingredients."  People understand those things.

So that's not a problem for me.  Numerosity is clearly not a problem.  Commonality is amply satisfied.  The named plaintiffs seem to be exactly where they need to be in terms of saying "this is why I did it, this is what I expected, here is what didn't work."

So I'm not seeing anything that is an impediment to certification.  Now, what happens at trial, who knows?  Summary judgment, that's for another day.  But whether this is reasonable or not to go forward on a class basis and whether it makes sense, it seems to me the plaintiffs have the better argument.

MR. STERN:  Let me go through my other reasons.

THE COURT:  Okay.

MR. STERN:  Still I'm not persuading you, but very quickly on the "what does tracks sleep" mean, we know the plaintiffs didn't adopt that meaning because they are not part

of the class the Fourth Amended Complaint alleges.  They didn't care that it tracks movement, not sleep.  They didn't know that in advance.  And so I would beg to differ with the Court's analogy to what "natural" means because here they didn't agree to what the meaning is that's alleged in the Fourth Amended Complaint.

And finally, we don't have to guess what it means because we've done a consumer survey, and a consumer survey -- and they haven't got one.  If we were at trial, the merits issue, they would be non-suited.

**THE COURT:**  I don't think that's right.  You do not need a consumer survey.  These are statements on a box.  This is not something -- this is an issue for another day.  I just want to push back on the idea that there's an inevitable hard stop for the plaintiffs just because they don't have a -- I would not assume that.  No.

**MR. STERN:**  Second reason -- let me move on.  I'm not persuading you on what does "track sleep" mean.

Second reason, there is a manageability problem, but it's a different problem than the plaintiffs have addressed in their reply brief.  The manageability problem stems from the problem of user error and that stems from the fact that sleep mode is manual and not automatic.

So in the briefing, the parties talked about the alarm clock hypothetical, and I wanted to come back to that because

it goes right to the heart of the problem here.  And if the Court will recall, in our opposition brief, we introduced the alarm clock metaphor and suggested that it shows in microcosm what's wrong with this picture.

So if the Court will recall, we had said imagine if this class action were a lawsuit against the manufacturer of an alarm clock claiming the alarm clock doesn't work, everybody who bought should get his or her money back because it will wake you up in the morning.  How would you separate those people who are unhappy who think it doesn't work for functional reasons -- I'm going to come back to functional in a moment, by the way -- versus those who simply forgot to set the alarm at night.  On this theory, everybody gets their money back, on plaintiffs' theory here.

Plaintiffs come back in their reply brief and they say, "No, this is as if the alarm clock manufacturer had left out a gear and it doesn't work for anybody."  And now we've come to the heart of the problem.  I didn't get a chance to address that because I didn't get the reply, but I'd like to address that hypothetical now and I think it will illustrate the problem.

That's not the case they filed.  The case they filed, Your Honor, is a word crime.

THE COURT:  A what?

MR. STERN:  A word crime.

**THE COURT:** Word crime.

**MR. STERN:** "Crime." I'm using that as a metaphor. Give me a little license here. It's a word crime.

**THE COURT:** Yes. I just wanted to make sure I heard it. I'm not pushing back on the analogy. Go ahead.

**MR. STERN:** Okay. The package --

**THE COURT:** A crime against language?

**MR. STERN:** Pardon me?

**THE COURT:** What is a "word crime"? They have misused language in a criminal way?

**MR. STERN:** Yes. It's purely a word crime. The package says "tracks sleep" --

**THE COURT:** Oh, that's different.

**MR. STERN:** -- when Fitbit should have said "tracks movement." It's a wrongful-noun case.

It also misses the point. They are not suing because there is a gear missing. They are suing because they claim it's not accurate, which is curious because three times in their reply brief, they say this is not about accuracy. They have said three times in their reply brief this is purely a wrongful-noun case and yet accuracy comes back into the case, and they have Dr. Montgomery-Downs who says, you know, this is just like flipping a coin. It's no better than chance, but I tell you what --

**THE COURT:** I just have to say -- let me jump in. I

don't think that's a fair reading of the case. Okay? I mean, the Fourth Amended Complaint has the words "cannot track sleep" and "cannot track sleep accurately" throughout it. Accuracy has been front and center from the Fourth Amended Complaint going on, a Complaint that I said was sufficient for 12(b)(6) and Rule 8 purposes.

So I think --

MR. STERN: It's not true.

THE COURT: I think you are setting up a theory that the plaintiffs are not actually liable for.

But let me just pause for a moment because you have had some airtime and let me hear from Mr. Perotti.

Anything you want to add?

MR. PEROTTI: The order of the day is to make your life simple, and I don't have anything to add.

THE COURT: Okay. All right.

I'm really not -- Mr. Stern, I'm not just -- I think for Rule 23 purposes, they have crossed the bar. Now, I need to get an order out on that, but that is my inclination.

Now, I do want to talk about the expert reports. Are you going to handle that as well?

MR. STERN: Mr. Bartolomeo will do that.

Your Honor had asked me to give my two or three reasons. I haven't finished. But it --

THE COURT: Well, they are all in the brief.

MR. STERN:  They're not in the brief.

THE COURT:  Give me the two -- you have two left.

MR. STERN:  Yes.

THE COURT:  You said four.  We've had two.  What are the two not -- that I have actually not seen.  That would be a good way of approaching it.

MR. STERN:  Before I do that, Your Honor said I have mischaracterized the Complaint, and the Complaint is about accuracy.  Three times in the reply brief, they deny it's about accuracy.  I urge you to look at page 1, line 6, quote, "It is not a question of accuracy but of core functionality."  That's at page 2.

Page 13, "It is not a question of accuracy.  It is a question of functionality."  Page 13.

THE COURT:  My point, though, Mr. Stern, is that both theories are front and center in the Complaint.  Okay?  So they're not forced to say something that -- they're not in a position of saying something in class cert that was not said in the Complaint.  There is no inconsistency.

MR. STERN:  Which brings me to my third point, and I only have two more.

If accuracy figures into this, then the question is, is it core functionality?  Does it work?  We know it works.  We know it works because we have the sleep data from Mr. Brickman and Ms. Clingman.  I can't refer to them because it's filed under

seal, but it's at page 6 to 8 of our opposition brief.

For a high percentage of their own readings, it worked consistent -- it tracked sleep consistent with what they self-reported in their depositions.

THE COURT:  That is perhaps a fine argument for summary judgment, and if you have a certified class, then if you prevail, everybody in that class will be foreclosed.

MR. STERN:  It affects typicality.

THE COURT:  All we're talking about now is --

MR. STERN:  But they're not part of the class because they didn't suffer the functionality breakdown --

THE COURT:  That's not an issue I can resolve on Rule 23, Mr. Stern.

MR. STERN:  And the last argument is a simple one. It's pure legal.  And that is the damages calculation.

The law is absolutely clear they must use price premium. Their expert has identified price premium and rejected that. They want to do a disgorgement theory.  Flat out not permitted. That's a hard stop.  They can't get past that.

THE COURT:  They want to do restitution.

MR. STERN:  Yes.  But think -- that's just a word. What are they trying to do?

THE COURT:  They're trying to get the money back that they paid for sleep function.

MR. STERN:  That's not what they're doing.  That's

exactly what they're not doing.

**THE COURT:**  In my view it is.

Mr. Perotti, tell me what your view of the restitution theory is.

**MR. PEROTTI:**  As you indicated, we are making a claim for restitution which under *Astiana* and a number of other cases available in California.

**MR. STERN:**  No.  Can I explain?  Restitution is just a term.  There are two ways you can measure damages --

**THE COURT:**  It's more than just a term.  It's the measure --

**MR. STERN:**  It's not.

**THE COURT:**  It's the measure of damages in this case.

**MR. STERN:**  It's not.

**THE COURT:**  It's not just a term.  It's what the plaintiffs will get should they prevail.  Restitution.

**MR. STERN:**  If I may explain.  It won't take me long, but I can explain the distinction.

**THE COURT:**  You can argue it.  Go ahead.

**MR. STERN:**  Their expert said, correctly, there are two appropriate measures of compensation here.  I'm not going to call it restitution.  Two measures.

One is you look at it from the consumers' perspective, how much extra did they give up because of a feature that didn't work.  Okay?  That's price premium.

The other way to look at it is how much did defendant gain in illegal profits because of selling a feature that didn't work.

The law -- this isn't a close question.  The law is absolutely clear, including Ninth Circuit law, that in a case like this, it has to be price premium and not disgorgement.

THE COURT:  That's fine.  I don't think they're fighting with you about that.

MR. STERN:  But then they have a --

THE COURT:  Mr. Stern, let me finish.  You keep setting up these shibboleths as if they're actually the plaintiffs' positions, and they're not.  They're not saying that.

They're saying the watch was, on average, $40 more if it had the sleep functionality than the ones that didn't.  There is a little bit of extra material cost involved that Fitbit incurred to make that, so they're not going to recover that.

So they're looking at the delta between what was paid for a device with sleep tracking or sleep functionality and one that wasn't, and it's about 30 bucks per device.

Is that right?

MR. PEROTTI:  Yes, sir.

THE COURT:  I just -- it is utterly non-mysterious to me that that is a reasonable position.  And restitution and disgorgement, they're remedies.  They're reasonable

approximations of damages.  They're not finely-parsed neurosurgical tools that we have to employ.  That's the rule of the Ninth Circuit.

The Ninth Circuit just came out late last year saying quite cogently in most cases, defendants' benefit is equal to the plaintiffs' loss, so restitution and disgorgement are functionally the same remedy.  I mean, that is -- that's just a common-sense approach to damages, and I think that's appropriate in this case.

Now, whether they get it or not, who knows?  But there's nothing inherently defective about their damages theory.

MR. STERN:  There absolutely is.  It's because *Comcast* says, Your Honor, that at class certification, the Court must rigorously scrutinize the damages model and make sure it fits with the theory of liability.

The law in this circuit is absolutely clear.  Every single court, including the *Astiana* decision that my friends on the other side just quoted, you must use price premium.  That is the only proper measure of restitution.

It would be error, Your Honor, to certify this class based on a disgorgement --

THE COURT:  Okay.  I disagree with that.

Let's talk about the experts.

MR. PEROTTI:  If we may, Mr. Margolis will deal with that.

**THE COURT:** All right.  I am having a problem, plaintiffs, with Burke Rosen.  I'm holding in my hand the Burke Rosen report.  You will notice it consists of one front and back page.  How is this an admissible expert opinion?

**MR. MARGOLIS:** Your Honor, in addition to the report --

**THE COURT:** By the way, let me be clear, just to jump in.  Bulk for bulk sake is not the test for admissibility.  The test is it has to be -- first, the expert has to be illuminating the jury on an issue that the jury on its own cannot understand without expert assistance.  That's the first and foremost task of the expert, is they need to help the jury, the trier of fact, understand the issue.

All this says is well, we think a reasonable measure of damages is the difference between what you paid for a Fitbit device with sleep functionality and what you didn't.  My problem is that's not beyond the understanding of any damages argument that's typically pitched to a jury, so I'm not sure it requires any expert testimony.

There's certainly no method or anything in there that -- in the one-and-a-half pages, literally one-and-a-half pages of the report -- that shows that there was any thinking behind that, which I think illustrates it's a relatively straightforward concept.

And the third thing is restitution, at the end of the day,

is going to be a legal issue that I will decide as to whether it's an appropriate measure of damages or not. So to the extent that they're saying yes, the legal rule should be restitution, that's just not admissible.

So I will add on top of that, if this is of any interest to you, I don't -- you're perfectly free to argue for a restitution remedy based on Fitbit's own documents and the facts of the purchase price and, you know, whatever it is they had to pay to put in the sleep functionality and the delta between that. You don't need an expert.

So what do you want to do with Mr. Burke?

MR. MARGOLIS: May I have five --

THE COURT: Burke Rosen?

MR. MARGOLIS: Yes, sir.

May I have five seconds to confer with counsel?

THE COURT: Ten. Take as much as you want. But I'm not seeing it.

(Counsel confer off the record.)

MR. PEROTTI: Your Honor, I would defer to Ron on the specifics of the expert, but what we would indicate is we agree with Your Honor that we do not need an expert and that type of an approach for damages.

So that we don't fall prey to an argument on appeal later on by the defense that we should have had an expert, we would simply direct your attention to the supplemental 26(e) filing

which we made of Dr. Rosen's deposition.  And in that filing, Dr. Rosen was then specifically asked the various questions that you raised, "what methodology do you use, what numbers did you subtract, how did you do it, what approach did you use," and he then went through, in painful detail, exactly what he put in and what he didn't put in in order to reach an actual number of a specific dollar for each Fitbit tracker.  And so --

THE COURT:  I haven't seen that.  I think you just filed that.  Let me ask you a question.  Was he just relying on Fitbit documents?

MR. PEROTTI:  He is analyzing Fitbit documents, yes, sir.

THE COURT:  I mean --

MR. PEROTTI:  And Melanie Chase's deposition testimony, yes.

THE COURT:  You can do that with Fitbit witnesses.

MR. PEROTTI:  I believe we can.

THE COURT:  Don't you think?

MR. PEROTTI:  I think we can.

THE COURT:  Do you want to withdraw Mr.-- is it two people?

MR. PEROTTI:  No.  Burke Rosen is a firm.

THE COURT:  Okay.  I think two people signed the report.

Anyway, do you want to withdraw that report?

MR. PEROTTI:  Yes, Your Honor.  We will do that.

THE COURT:  Okay.  It should not injure your ability to seek damages.

MR. PEROTTI:  All right.  Thank you, sir.

THE COURT:  All right.  Granted.

MR. BARTOLOMEO:  Thank you, Your Honor.

THE COURT:  Now, on the issue of -- everybody has got two names in this case.  Montgomery-Downs.  I'm having trouble understanding what the problem is.

Now, you did have the report.  The plaintiffs did provide the report to the defendants in January of 2017; right?

MR. BARTOLOMEO:  That's correct, Your Honor.

THE COURT:  So you have had it.  They didn't feature it in their opening brief, but you deposed -- is it one person?

MR. MARGOLIS:  It's one person, Dr. Montgomery-Downs, yes, sir.

THE COURT:  Did you depose Dr. Montgomery-Downs?

MR. BARTOLOMEO:  We did, Your Honor.

THE COURT:  And you asked him about -- male?

MR. MARGOLIS:  "Her."

THE COURT:  You asked her about the report?

MR. BARTOLOMEO:  We did, Your Honor.

THE COURT:  So you haven't suffered any discovery deficiencies with respect to Dr. Montgomery-Downs?

MR. BARTOLOMEO:  We certainly don't dispute that the

report was submitted on time by the plaintiffs on the 31st, but our objection relates to its introduction for the first time in class certification on reply which deprived Fitbit of the opportunity to respond to it without a supplemental filing, which isn't permitted under the rules.

**THE COURT:**  Well, I think I have an answer for that, but -- Mr. Laks?  No, no.  Who --

**MR. PEROTTI:**  Mr. Margolis and Mr. Perotti.

**THE COURT:**  Mr. Margolis?  You're not on my list. Okay.

So, Mr. Margolis, is it your view that the Montgomery -- do I need to even look at that report to decide class certification?

**MR. MARGOLIS:**  No, sir.

**THE COURT:**  That was my sense as well.  So I'm going to do a little bit more reflection, but my inclination is I think that the short answer is I don't need to look at that or rely on it.  So I don't think it's going to be a big issue. Okay.

I'm not going to strike it, but I'm almost certainly not going to rely on it.  I don't think it's necessary for class cert.

If I change my mind and it turns out that I think it's now a critical issue, I will extend Fitbit an opportunity to do a surreply.  Okay?  So you will have a chance to say something,

but my strong sense right now is I don't need to open the cover of it to decide class cert.  Okay?

All right.  Now, anything else I can help you with today?

MR. PEROTTI:  No, Your Honor.

THE COURT:  What's going on next?  Where are you all now?  Trial is in July; right?

MR. PEROTTI:  The next step would be -- well let me --

(Counsel confer off the record.)

MR. STERN:  The next step scheduled is dispositive motions, April 21, and we intend to file dispositive motions.

THE COURT:  Okay.  Now, where are you all in maybe discussing an informal resolution?

MR. PEROTTI:  We have proposed it to Fitbit, and we have received a response of zero.

MR. STERN:  They've proposed nothing.  They proposed to us, "Do you want to talk about settlement?"  That's as far as it got.  But there was no demand, and we asked them, "If you have a demand, make us a demand."

THE COURT:  You would like to see someone to help you start the discussion?

MR. STERN:  Yes.

THE COURT:  Who are you looking at?

MR. PEROTTI:  We're operating as teams.

THE COURT:  Everybody was looking at the same, including the plaintiff.  Who is the actual person making the

decision back there?  Is that Ms. Bartolomeo?

MR. STERN:  Ms. Bosman.

THE COURT:  Are you with Fitbit?

MS. BOSMAN:  No, Your Honor.

THE COURT:  Why don't you come on up.  Maybe it will be easier if we can just talk.

Would you like to go to someone, a magistrate judge?

MS. BOSMAN:  We are willing to sit down with a magistrate judge.

MR. PEROTTI:  Yes, sir.

THE COURT:  Do you have any preferences?  You're from out of the district.

Do you have any preferences?

MS. BOSMAN:  We can provide several names to plaintiffs and see if they are agreeable.

MR. PEROTTI:  Is it Judge Ryu?

THE COURT:  Judge Ryu.  That's an excellent choice. She is in Oakland.

MR. STERN:  There are several magistrate judges that I have used in mediations.

THE COURT:  Is there one you favor?

MR. STERN:  We -- well, Magistrate Judge Beeler was very hard-working and helped settle a case.

THE COURT:  Okay.  All right.  Well, I will see -- I'll choose one of those two, and then we'll make a reference.

It's not going to derail anything.  You're going to keep case management going forward, but this is, I think, a good time to start, if you haven't -- and it sounds like you haven't -- it's a good time to start talking.

MR. PEROTTI:  Yes, sir.

THE COURT:  Do you have a demand in mind?  Are you thinking about what you might propose?

MR. PEROTTI:  Yes, sir.  We do.

THE COURT:  Okay.  Do you want to share that now or do you want to wait --

MR. PEROTTI:  I'd rather wait until we get to the --

THE COURT:  All right.  How is everything else going?  Discovery is done or close to being done?

MR. PEROTTI:  Everything else is going fine.

THE COURT:  Trial is set for July, I believe.

MR. PEROTTI:  Yes, sir.

THE COURT:  Is that right?  Okay.  Anything else?

MR. PEROTTI:  No, sir.  Thank you.

THE COURT:  You look suspicious.  There must be something else.  There's got to be something else.  No?  Okay.  All right.  Thank you.

Oh, sorry.  There is one other thing.  I forgot about -- the sealing motions are starting to become a small Mount Everest.  What I need you to do -- it has now tripped my Plan B for sealing motions, and that is now that there is so

many, you need to go back -- it's in my standing order for civil cases so take a look at it.

You need to go back and file a consolidated sealing motion where you all -- now that you know who wants to seal what and who doesn't want to seal things, you get together, talk about it, and then send me a new set of the things you actually want to seal.  I'm assuming it's mostly Fitbit.  Okay?

So do that.  So I'm going to terminate all the current ones and just wait for you to send me a new one and then one consolidated one, and it will be a lot more effective for me to deal with.  Okay.  Good.  Thank you.

(Proceedings adjourned at 11:05 a.m.)

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Tuesday, April 11, 2017

*Pamela A. Batalo*

Pamela A. Batalo, CSR No. 3593, RMR, FCRR
U.S. Court Reporter