UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES P. BRICKMAN, et al.,<br><br>  Plaintiffs,<br><br>v.<br><br>FITBIT, INC.,<br><br>  Defendant. | Case No. 3:15-cv-02077-JD<br><br>**ORDER RE SUMMARY JUDGMENT AND DAUBERT MOTIONS; ORDER SETTING TRIAL DATE**<br><br>Re: Dkt. Nos. 153, 154 |

Plaintiffs allege that defendant Fitbit, Inc. ("Fitbit") misled consumers about the functionality of sleep tracking on its wearable devices. Dkt. No. 60. The Court recently certified California and Florida state-law classes, *Brickman, et al. v. Fitbit, Inc.*, No. 3:15-CV-02077-JD, 2017 WL 5569827 (N.D. Cal. Nov. 20, 2017), and finds that genuine disputes of material fact preclude summary judgment. Dkt. No. 153.[1] Fitbit's motion to strike the report and testimony of plaintiffs' expert, Dr. Hawley Montgomery-Downs, on *Daubert* grounds is also denied. Dkt. No. 154.

## BACKGROUND

The basic facts are undisputed. Fitbit is a well-known maker of wearable fitness devices. Starting in 2009, Fitbit released several models that it marketed as equipped with sleep-tracking. The models in dispute here are the Fitbit Ultra, One, and Flex. *Brickman*, 2017 WL 5569827, at *1. Fitbit made the same representations about sleep functionality for all of the devices, including on product packaging. *Id.* Among other statements, Fitbit represented that the devices could track

---

[1] The parties' filings are a thicket of redacted and unredacted briefs and exhibits. Fitbit's unredacted filing is at Dkt. No. 152-5 and the public, redacted version is at Dkt. No. 153. The plaintiffs' opposition to the motion for summary judgment was filed under seal at Dkt. No. 165. Fitbit's unredacted reply is at Dkt. No. 174, and the public, redacted version is at Dkt. No. 176. To the extent possible, the Court cites to public, redacted filings.

"hours slept," "times woken up," and "quality of sleep." Fitbit also presented images of charts and graphs displaying the data the devices were said to collect. *Id.* The devices use an accelerometer to detect movement. Dkt. No. 153 at 3.

Plaintiffs Brickman and Clingman were interested in the sleep functionality, and they each bought a device marketed with that feature. After wearing the devices, plaintiffs claim they tracked motion and movement only, and not sleep. Dkt. No. 60 at 9-10. The essential claim in the case is that consumers were deceived into paying more for Fitbit devices sold with sleep-tracking functionality "because the Fitbit devices can only measure movement and not sleep." *Id.* at 2-3.

The Court certified a class of California consumers and a class of Florida consumers. *Brickman*, 2017 WL 5569827, at *1. The California class consists of California residents who purchased and registered online a Fitbit Flex, One, or Ultra in the State of California between 2009 and October 27, 2014. The Florida class is defined the same way for residents of that state. The California class is certified for claims under the California Unfair Competition Law ("UCL"), the California Consumers Legal Remedies Act ("CLRA"), common law fraud, negligent misrepresentation, and quasi-contract/unjust enrichment. The Florida class is certified for claims under Florida's Deceptive and Unfair Trade Practices Act ("DUTPA") and quasi-contract/unjust enrichment. Florida plaintiff Brickman is proceeding as an individual on a Florida negligent misrepresentation claim. *Id.* at *9.

**LEGAL STANDARDS**

"A party may move for summary judgment, identifying each claim or defense -- or the part of each claim or defense -- on which summary judgment is sought. The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may dispose of less than the entire case and just portions of a claim or defense. *Smith v. State of California Dep't of Highway Patrol*, 75 F. Supp. 3d 1173, 1179 (N.D. Cal. 2014).

Under Rule 56, a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict" for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it could affect the outcome of the suit under the governing law. *Id.* at 248-49. In

determining whether a genuine dispute of material fact exists, the Court will view the evidence in the light most favorable to the non-moving party and draw "all justifiable inferences" in that party's favor. *Id.* at 255. A principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

The moving party must initially establish the absence of a genuine issue of material fact, which it can do by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. It is then the nonmoving party's burden to go beyond the pleadings and identify specific facts that show a genuine issue for trial. *Id.* at 323-34. "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). It is not the Court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quotations omitted).

## DISCUSSION

Fitbit seeks summary judgment on the grounds that: (1) its representations are not false; (2) consumers were not deceived and did not rely on the representations; (3) aberrant sleep readings could have been caused by user error; and (4) plaintiffs cannot show they are entitled to damages. *See* Dkt. No. 153 at 1-2. These are the main issues in the case, and they are replete with disputes of fact for which both sides have more than merely colorable evidence. Consequently, summary judgment is denied across the board and the case will proceed to trial for resolution. For the sake of clarity, illustrations of some of the fact disputes are discussed for each argument.

**I.     The Tracking Representations**

Fitbit says it is entitled to summary judgment on its marketing representations because actigraphy, which is said to monitor sleep by assessing physical movement, is a valid and reliable way to track sleep that is used by sleep scientists. *Id.* at 8. Fitbit contends that there is no genuine dispute about the ability of actigraphy to track "hours slept," "times woken up," and "sleep quality." *Id.* at 9.

That is far from true. The dispute over the accuracy and reliability of actigraphy as used in the devices to track sleep is the main factual issue in this case. Fitbit tenders declarations, exhibits

3

and other materials in support of its position on that dispute, and plaintiffs do the same. For example, in opposition to Fitbit's contentions, plaintiffs submitted a report from an expert witness, Dr. Naresh Punjabi, who is a professor of medicine and epidemiology at the Johns Hopkins University Schools of Medicine and Public Health and a specialist in "the epidemiology of sleep disorders," among other areas. Dkt. No. 116-1 at ECF p.2. The report contrasts the utility of actigraphy in tracking sleep to the "gold standard measure" of polysomnography. *Id.* at ECF p.3. Polysomnography takes electrophysiological measurements of brain activity, muscle activity, and eye movements and is, in Dr. Punjabi's view, the "only method that can truly distinguish between sleep and wakefulness." *Id.* Dr. Punjabi also states that "it is well established that people stop moving well before the appearance of sleep on the EEG and resume moving before transitioning from the sleep state to wakefulness." *Id.* For these and other reasons, actigraphy may possibly provide a "crude approximation" of total sleep time, but "is not a technique for measurement in sleep depth, continuity, and structure," and "cannot provide valid information regarding sleep quality." *Id.* at ECF pp.5-6.

That is only a portion of plaintiffs' evidence, but it is enough to illustrate the fact dispute about the efficacy of actigraphy as a sleep-tracking technology, and the truth or falsity of Fitbit's representations. Fitbit's curated selection of excerpts from Dr. Punjabi's deposition testimony only highlights the parties' factual disagreements. *See, e.g.*, Dkt. No. 153 at 8. Summary judgment is denied on this issue.

**II.     Device Performance and the *Daubert* Challenge**

Fitbit says that its devices performed as represented and that plaintiffs do not have evidence showing the devices failed to track sleep. *Id.* at 9. This too entails disputed issues of fact that preclude summary judgment.

As an initial matter, plaintiffs have tendered witness testimony that Fitbit's devices recorded false positives, indicating that the user was asleep when she was, in fact, wide awake. *See* Dkt. 122-12 at 22 (Brickman testifying that his device treated awake hours watching television as sleep); Dkt. 122-13 at 43 (Clingman testifying that her device recorded sleep while she was awake and pushing a grocery cart). Fitbit suggests that only an expert should be allowed to opine

4

on performance, Dkt. No 153 at 10, but it hardly takes an expert to observe that a device says the user is sleeping when she is actually shopping. Plaintiffs' user evidence is perfectly admissible percipient witness testimony, all the more so because the challenged devices were sold to consumers precisely to advise them about their sleep and activity levels. Fitbit's case citations are inapposite because they pertain to suits for strict product liability, which is not an issue or claim in this case. *See Howard v. Omni*, 203 Cal. App. 4th 403, 426 (2012) (strict liability design defect requires expert testimony); *Rodas v. Porsche Cars N. Am., Inc.*, No. CV14-3747 PSG (MRWx), 2016 WL 6033535, at \*6 (C.D. Cal. Apr. 4, 2016) (same).

Plaintiffs have also tendered expert witness evidence and testimony by Dr. Hawley Montgomery-Downs to the effect that "Fitbit consumer wearable trackers are not currently able to accurately track hours slept, times awakened, or sleep quality." Dkt. No. 118-1 at ECF p.6. Dr. Montgomery-Downs is a tenured member of the psychology department faculty at West Virginia University and has researched sleep and sleep disorders since 1993. *Id.* at ECF p.1 Her expert opinions are based in part on a peer-reviewed and published study that she conducted in 2012, which found that "Fitbit's average specificity (the proportion of accuracy at identifying wake when the wearer was awake) was only 19.8 [percent]." *Id.* at ECF p.6. Dr. Montgomery-Downs also based her opinion on other peer-reviewed assessments of Fitbit devices published before November 2016. *Id.*

Fitbit seeks to strike these opinions as irrelevant and inadmissible under Rule 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Its objections are not well-taken. As an initial matter, there can be no serious question that Dr. Montgomery-Downs's opinions are directly relevant to the main dispute in this case -- whether Fitbit's devices accurately tracked sleep data as marketed.

Dr. Montgomery-Downs's work is also admissible expert testimony under Rule 702. Rule 702 imposes "a flexible test examining the 'reliability' and 'fit' of the offered expert testimony." *Murray v. Southern Route Maritime SA*, 870 F.3d 915, 922 (9th Cir. 2017). Fitbit mainly contests reliability here. Reliability asks "whether the reasoning or methodology underlying the testimony is scientifically valid," *Daubert*, 509 U.S. at 592-93. Factors relevant to this inquiry include: "(1)

5

whether the theory can be and has been tested, (2) whether the theory has been peer reviewed and published, (3) what the theory's known or potential error rate is, and (4) whether the theory enjoys general acceptance in the applicable scientific community." *Murray*, 870 F.3d at 922. Those factors "are not a definitive checklist or test" and "the reliability analysis remains a malleable one tied to the facts of each case. Later cases have reiterated that the *Daubert* factors are exemplary, not constraining." *Id.* (internal quotations and citations omitted).

It bears repeating that the test "is not the correctness of the expert's conclusions but the soundness of his methodology. That the research is accepted for publication in a reputable scientific journal after being subjected to the usual rigors of peer review is a significant indication that it is taken seriously by other scientists, i.e., that it meets at least the minimal criteria of good science." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995).

Viewed in the light of these cases, Dr. Montgomery-Downs's report and opinions are admissible. Her opinions are based on her substantial professional experience in the study of sleep, and in significant part on her own pre-litigation research, which included a study published in *Sleep & Breathing* after peer review. Fitbit has not shown that Dr. Montgomery-Downs's overall qualifications, opinions or methods fall outside the norm for sleep researchers.

Turning to Dr. Montgomery-Downs's report, Fitbit says she did not reliably assess several studies about Fitbit's sleep-tracking functionality. *See, e.g.*, Dkt. No. 152-17 at 6-7. That is overstated. It is true the report is compact and does not treat the studies in detail, but her deposition testimony shows that she reviewed and evaluated them. *See, e.g.*, Dkt. No. 152-14 at 97-99. Among other testimony, Dr. Montgomery-Downs said that she discounted the findings of three studies for what she considered "fatal flaws." *Id.* at 108. One of those studies compared results to a sleep diary rather than polysomnography, another compared results to an actigraph rather than polysomnography and did not calculate sensitivity and specificity, and the last was published in a payment-for-publication journal. *Id.* at 98, 101; Dkt. No. 118-1 at ECF p.6.

Fitbit also argues that Dr. Montgomery-Downs was unduly cavalier in her assessment of other studies. It says, for example, that she credited a study that compared Fitbit data to data recorded by a Z machine, even though she did not know how a Z machine compares to

polysomnography. Dkt. No. 152-17 at 8. Dr. Montgomery-Downs addressed that by testifying that she knew that a Z machine uses "EEG [measurement of electrical activity from the scalp], EOG [eye movement] and EMG [muscle activity], and because what [the study] showed was that the device was not well validated." Dkt. No. 152-14 at 132; *see also id.* at 131-33; Dkt. No. 116-1 at ECF p.3.

Fitbit characterizes this testimony as circular reasoning and as evidence that Dr. Montgomery-Downs cherry-picked studies that validated the position of her own publications. That may be fertile grounds for cross-examination, but it does not make Dr. Montgomery-Downs's opinions inadmissible. Taken as a whole, Dr. Montgomery-Downs's report and opinions are "not the 'junk science' Rule 702 was meant to exclude," and "the interests of justice favor" putting Fitbit's critiques "in the hands of the jury and relying on the safeguards of the adversary system -- '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof'" -- to test any potentially shaky but admissible evidence. *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237 (9th Cir. 2017) (citing *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) and *Daubert*, 509 U.S. at 596). While her report is quite concise, brevity alone is not an automatic disqualifier under Rule 702 or *Daubert*, particularly when, as here, indicia of reliability and validity are present. Consequently, Fitbit's motion to strike is denied.

Fitbit's other performance-related contention -- that user error is the real source of any performance problems -- is again an issue of disputed fact, including possible issues of credibility, that a jury should resolve. Fitbit's insistence that plaintiffs must prove that they and the class used sleep mode correctly, Dkt. No. 153 at 20-21, misunderstands the plaintiffs' theory of liability. Plaintiffs allege that the devices do not and cannot "track sleep" as represented, regardless of whether sleep mode is turned on correctly or not. *See Brickman*, 2017 WL 5569827, at *8. Summary judgment on device performance and possible misuse is denied.

**III.  Consumer Deception and Reliance**

Fitbit argues that plaintiffs have no evidence they were individually deceived, that members of the public are likely to be deceived, that the sleep-tracking representations were

material, or that they relied on the sleep-tracking representations. Dkt. No. 153 at 14. It is enough for present purposes to note that these issues are strongly contested by the parties on conflicting evidence, and so are not amenable to resolution by summary judgment. In addition, the Court addressed Fitbit's arguments on individual deception, materiality, and individual reliance in the class certification context. *See Brickman*, 2017 WL 5569827, at *4 (Brickman and Clingman's deposition testimony showed that they relied on the "tracks sleep" representation and were individually deceived; their testimony was consistent with the complaint's allegation that the devices do not work because they track movement only); *id.* at *6-7 (individual reliance is not required for the California UCL, the Florida DUTPA, or either state's quasi-contract/unjust enrichment claims; reliance may be inferred for the CLRA and California common law claims when the facts show that material misrepresentations were made to the entire class; representations were material).

On likelihood of deception, plaintiffs have enough evidence to permit a reasonable jury to find that Fitbit's representations about the devices' ability to track sleep quality, hours slept, and awakenings may have been misleading, and so deceptive. *See, e.g., Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1026 (9th Cir. 2008); *William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995).

Fitbit states that it has survey evidence showing that consumers were unlikely to be deceived. Dkt. No. 153 at 17-18. Even assuming purely for discussion that the survey is methodologically sound and otherwise admissible, that only begs the question. The survey may be evidence that supports Fitbit's defense, but plaintiffs have opposing evidence on deception, and the clash between the two frames a genuine dispute that precludes summary judgment.

On class-wide reliance, Fitbit claims that its survey of actual purchasers showed "for 56.3% of respondents, the sleep-tracking feature did not influence their decision to buy." *Id.* at 17.

Even taking that characterization at face value,[2] Fitbit's data suggests that around half of actual purchasers were influenced by the sleep-tracking feature in their purchase decision. That in no way supports summary judgment in favor of Fitbit against the Florida and California classes.

**IV. Damages**

Fitbit's last argument is that plaintiffs cannot prove individual or classwide damages. *Id.* at 22-25. As the Court stated in the certification order, "Plaintiffs are now committed to seeking damages in the form of the price difference between Fitbit devices with sleep tracking and equivalent devices without it, with adjustments for other feature differences as warranted. They intend to rely on Fitbit documents and witnesses for evidence on these issues. This is a perfectly reasonable approach that links the proposed damages directly to plaintiffs' claims that they were deceived into paying a premium for the sleep functionality." *Brickman*, 2017 WL 5569827, at *7 (internal quotations and citations omitted).

Fitbit argues that this approach necessitates a "cost-to-manufacture theory" implying zero damages because the "sleep feature itself is simply an algorithm that could be applied to . . . accelerometer data that's being tracked at the time." Dkt. No. 153 at 24; Dkt. No. 193-2 at 124. This argument is not well-taken. Regardless of the marginal cost to Fitbit of including sleep-tracking functionality, it is a common sense inference from evidence about product pricing that Fitbit was able to charge more for devices equipped with sleep-tracking functionality than for equivalent devices without sleep-tracking functionality. Fitbit has not presented any evidence showing otherwise.

---

[2] Fitbit's survey asked a participant about the significance of sleep-tracking functionality at the time of purchase only if she previously stated that sleep-tracking was a feature on her device. Dkt. No. 122-9 at 62-63. Out of the 206 who recalled that their purchased devices had sleep-tracking functionality, 131 said their purchase decision was influenced by sleep-tracking functionality. In other words, out of those 206, 64% said sleep-tracking mattered to the purchase decision and 36% said it didn't matter.

9

**CONCLUSION**

Summary judgment is denied. The motion to strike Dr. Montgomery-Downs's report and opinions is denied. The pre-trial conference is set for **1:30 p.m. on March 22, 2018.** Trial is set for **9:00 a.m. on April 30, 2018**.

**IT IS SO ORDERED.**

Dated: December 8, 2017

JAMES DONATO
United States District Judge